# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| _____ ) | |
| TAMECKA MERRICK, *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civil Action No. 17-2133 (ABJ) |
| ) | |
| DISTRICT OF COLUMBIA, ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

## <u>MEMORANDUM OPINION</u>

Plaintiffs Tamecka Merrick and her adult son, Ronald Washington, brought this action against defendant, the District of Columbia, seeking to collect attorneys' fees incurred while bringing a successful administrative action under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400, *et seq.* Now pending before the Court is plaintiffs' motion for attorneys' fees and costs.[1] Pls.' Mot. for Att'ys' Fees [Dkt. # 7] ("Pls.' Mot."); Pls.' Mem. of P. & A. in Supp. of Pls.' Mot. [Dkt. # 7] ("Pls.' Mem.") at 2.

Plaintiffs are seeking $37,682.80 in attorneys' fees and $73.50 in costs related to the underlying administrative action, Compl. [Dkt. # 1] ¶ 21; Statement of Account, Ex. 12 to Pls.' Mem. [Dkt. # 7-12] ("Statement of Account I") at 12, in addition to $21,013.40 in attorneys' fees and $492.40 in costs for pursing this action in federal court. *See* Pls.' Mem. at 13; Statement of Account, Ex. 1 to Pls.' Suppl. Filing. [Dkt. # 11-1] ("Statement of Account II") at 5.

---

1   The parties agreed in their Rule 16.3 Report that this case can be resolved through a dispositive motion for attorneys' fees instead of a motion for summary judgment. *See* Rule 16.3 Report [Dkt. # 6] at 2.

For the following reasons, the motion will be granted in part. The Court will award $36,583.20 in attorneys' fees and $73.50 in costs for pursuing the underlying administrative proceeding, and $12,000.00 in attorneys' fees and $492.40 in costs for litigating the fee petition in this Court.

## BACKGROUND

Ronald Washington is a deaf adult student who requires instruction to be provided in American Sign Language ("ASL"). Hearing Officer Determination, Ex. 1 to Pls.' Mem. [Dkt. # 7-1] ("HOD") at 2; *see also id.* ¶ 2. He also suffers from impulsive and anger-based behavioral outbursts. *Id.* ¶ 6. He has attended more than a dozen public, non-public, and residential placements in the last seven years. *Id.* ¶ 4; Pls.' Mem. at 2–3.

At the end of November 2016, Mr. Washington was released from a D.C. Department of Youth Rehabilitation Services ("DYRS") school and was placed in a foster home in Maryland. HOD at 1–2; *see also id.* ¶ 1. Prior to his release, Stevie Nabors, Mr. Washington's court-appointed special education advocate, emailed the District of Columbia Public Schools' Director of Special Education and requested an Individualized Education Program ("IEP") meeting for Mr. Washington. Pls.' Mem. at 3; *see also* Ex. 2 to Pls.' Mem. [Dkt. # 7-2]. Mr. Nabors had a conference call with several employees at District of Columbia Public Schools ("DCPS"), but DCPS did not adopt the program he proposed, and it did not offer to convene an IEP meeting. Pls.' Mem. at 3.

Following DCPS' refusal to provide services or convene an IEP meeting, Ms. Merrick filed an administrative due process complaint on her son's behalf. Compl. ¶ 9. She alleged that DCPS denied her son a free appropriate public education ("FAPE") when it failed to provide him with special education services such as ASL tutoring. *Id.* ¶ 11; Pls.' Mem. at 3; HOD at 2–3. Further, she requested the following forms of relief: (1) an order compelling DCPS to provide Mr.

Washington with special education services by an ALS certified instructor through DCPS' Home and Hospital Instruction Program ("HHIP"); (2) a compensatory education award in the form of 150 hours of instruction in ASL; and (3) an independent evaluation to determine appropriate compensatory education for Mr. Washington. HOD at 3; 12–14.

The Hearing Officer concluded that DCPS did indeed deny Mr. Washington a FAPE when it failed to implement his IEP after he was placed in a foster home in late November 2016. HOD at 12. And on April 6, 2017, the Hearing Officer ordered that Mr. Washington receive 120 hours of individual tutoring in ASL either through DCPS or through an independent tutor funded by DCPS at market rates. HOD at 15; Compl. ¶¶ 11–12; Pls.' Mem. at 4.

On October 16, 2017, plaintiffs filed a complaint in this Court seeking to collect fees and costs incurred as part of the administrative hearing. *See generally* Compl. Plaintiffs filed a motion for attorneys' fees on January 12, 2018, *see* Pls.' Mot., and the motion is fully briefed.[2]

## STANDARD OF REVIEW

Under the IDEA, the Court has the discretion to "award reasonable attorneys' fees as part of the costs . . . to a prevailing party" in an administrative proceeding "who is the parent of a child with a disability." 20 U.S.C. § 1415(i)(3)(B)(i)(I). If a court determines that the plaintiff seeking attorneys' fees is a prevailing party, it must determine whether the requested attorneys' fees are reasonable. *Reed v. District of Columbia*, 843 F.3d 517, 520 (D.C. Cir. 2016). Courts typically determine the reasonableness of attorneys' fees based on the "number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983).

---

2    Def.'s Opp. to Pls.' Mot. [Dkt. # 8] ("Def.'s Opp."); Pls.' Reply to Def.'s Opp. [Dkt. # 9] ("Pls.' Reply").

A plaintiff bears the burden of establishing both the reasonableness of the hourly rate and the reasonableness of the number of hours spent on a particular task. *Eley v. District of Columbia*, 793 F. 3d 97, 100 (D.C. Cir. 2015), citing *Covington v. District of Columbia*, 57 F.3d 1101, 1107–08 (D.C. Cir. 1995); *see also In re North*, 59 F.3d 184, 189 (D.C. Cir. 1995). To show the reasonableness of the hourly rates, a plaintiff must submit evidence related to: (1) "the attorneys' billing practices"; (2) "the attorneys' skill, experience, and reputation"; and (3) "the prevailing market rates in the relevant community." *Covington*, 57 F.3d at 1107. To show the reasonableness of hours spent on a task, a plaintiff must submit a "sufficiently detailed [invoice] to permit the District Court to make an independent determination whether or not the hours claimed are justified." *Nat'l Ass'n of Concerned Veterans v. Sec'y of Def.*, 675 F.2d 1319, 1327 (D.C. Cir. 1982).

After the moving party has met this burden, the number of hours and rate are presumed reasonable, and the non-moving party must rebut the moving party's showing with "equally specific countervailing evidence." *Covington*, 57 F.3d at 1109–10, quoting *Nat'l Ass'n of Concerned Veterans*, 675 F.2d at 1326.

**ANALYSIS**

Defendant does not dispute that plaintiffs were the prevailing parties in the underlying administrative action within the meaning of the IDEA and that they are therefore entitled to some amount of attorneys' fees. *See* Def.'s Opp. at 2. The only question before the Court is whether the attorneys' fees sought by plaintiffs are reasonable.

**I.     The hours expended by plaintiffs' counsel were reasonable.**

Plaintiffs ask for $37,682.80 for 96.5 hours of work performed to litigate the underlying administrative proceeding. Defendant does not take issue with the documentation provided in

support of this request, or with any specific hours billed.[3]  However, it argues that a "15% reduction

is appropriate because much of the relief sought was not obtained."  Def.'s Opp. at 19.[4]  At a

minimum, defendant asks the Court to "reduce the invoice by the hours devoted exclusively to the

placement sought but not obtained," and it points to an entry for 1.5 hours of work that related

exclusively to the HHIP placement request.  *Id*.; *see* Statement of Account I at 1 ("Legal research:

requirements for Home/Hospital Instruction Program ("HHIP") and whether RW would qualify.").

        Plaintiffs have the burden of demonstrating that the number of hours expended on

particular tasks by their attorneys were reasonable.  *Nat'l Ass'n of Concerned Veterans*, 675 F.2d

at 1327.  Attorneys must "maintain contemporaneous, complete and standardized time records

which accurately reflect the work done by each attorney."  *Id.*  "Where the documentation of hours

is inadequate, the district court may reduce the award accordingly."  *Hensley*, 461 U.S. at 433.

        Courts also have the discretion to reduce attorneys' fees awards to account for partial or

limited success on the merits by either eliminating specific hours or reducing the award as a whole.

*Hensley*, 461 U.S. at 436–37.  For purposes of reducing the award amount based on the lack of

success, a court should consider whether "the plaintiff achieve[d] a level of success that makes the

hours reasonably expended a satisfactory basis for making a fee award."  *Id*. at 434.  This is a

---

3       However, the parties and the Court identified certain typographical errors, and the fee
award will be adjusted accordingly. The first mistake was a time entry made on March 10, 2017
that billed Mr. Moran's research time at a rate of $602.00 per hour instead of $581.00.  *See*
Statement of Account I at 7.  The bill should reflect a charge of $929.60 instead of $963.20, so the
bill will be reduced by $33.60. Next, there is an entry from March 23, 2017 in which Mr. Nabors'
travel time was inadvertently billed at $166.00 per hour instead of $161.00 per hour.  *See* Statement
of Account I at 10; Def.'s Opp. at 3; Pls.' Reply at 2.  The bill reflected a charge of $66.40 for
travel, but it should have only charged $64.40.  The total bill will be reduced by $2.00 for this
error.  In addition, plaintiffs have withdrawn a February 6, 2017 entry in which their attorneys
accidentally charged 0.10 hours of time at a rate of $5,810 for a total of $581.00.  Pls.' Reply at 5.
This will reduce the bill by $581.00.  Altogether, the fee award will be reduced by $616.60.

4       It is unclear if defendant is asking for a fifteen percent reduction in hours or to the total fee
award.

results-oriented inquiry: "it is the *degree* of the plaintiff's success that is the critical factor to the determination of the size of a reasonable fee." *A.S. v. District of Columbia*, 842 F. Supp. 2d 40, 47 (D.D.C. 2012), citing *Tex. State Teachers Ass'n v. Garland Indep. Sch. Dist.*, 489 U.S. 782, 786 (1989).

Here, the student's parent brought an administrative complaint in order to litigate one issue: whether Mr. Washington was denied a FAPE when DCPS failed to implement his IEP when he moved into a foster home. The complaint sought three forms of relief for the alleged violation of the IDEA: (1) an order compelling DCPS to provide Mr. Washington with a certified ASL tutor through the Home and Hospital Instruction Program; (2) 150 hours of compensatory education; and (3) an independent education evaluation. HOD at 3; 12–14.

For the reasons set out in the Hearing Officer's decision, the relief awarded was 120 hours of compensatory education in AS. *See* HOD at 15. But the Court does not find it to be appropriate to reduce the attorneys' fees award by fifteen percent. "A reduced fee award is appropriate if the relief . . . is limited in comparison to the scope of the litigation as a whole." *Hensley*, 461 U.S. at 440; *see, e.g.*, *Young v. District of Columbia*, 139 F. Supp. 3d 15, 23–24 (D.D.C. 2015) (reducing the fee award by twenty-five percent because the plaintiff only prevailed on one of the three issues presented, and the hearing officer denied all relief sought except for compensatory education). That is not the case here. Ultimately, Ms. Merrick was successful on the fundamental issue that was litigated before the administrative board, and Mr. Washington received the primary form of relief requested: continued instruction by a qualified ASL tutor to make up for the hours of education he had been denied. *See* HOD at 15. Generally, an attorney "should recover a fully compensatory fee" where "a plaintiff has obtained excellent results." *Hensley*, 461 U.S. at 435.

Moreover, it seems as if the 120 hours of compensatory education was awarded in place of an independent education evaluation because awarding both would have been duplicative. *See*

Def.'s Opp. at 19 ("The award lacked an [independent education evaluation], but did provide compensatory education, which was the purpose behind seeking an [independent education evaluation]"). And, the Hearing Officer rejected Ms. Merrick's request for services through the HHIP because that would have marked a significant change in the student's educational placement. HOD at 12. Since his IEP team was scheduled to meet soon, the Hearing Officer concluded that "it would not be appropriate . . . to dictate [Mr. Washington's] ongoing placement." *Id.* at 12–13.

Finally, the administrative hearing involved one claim based on one set of facts and legal theories, and the expenditure of attorney time would not have changed dramatically if the hearing officer had awarded the other forms of requested relief. *See Hensley*, 461 U.S. at 435 ("[T]he district court should focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation."). However, the Court does recognize that Mr. Washington was not awarded special education services through the HHIP, so it will reduce the total hours expended by the 1.5 hour time entry identified by defendant. *See* Statement of Account I at 1.

Therefore, the Court finds that plaintiffs' counsel reasonably expended 96.5 hours of work, but it will reduce the award by $483.00, which reflects the 1.5 hours charged by Mr. Nabors on October 3, 2016 for research related to the Home Hospital Instruction Program.

## II.   Plaintiffs' counsels' rates were reasonable.

Plaintiffs bear the burden of establishing the reasonableness of the hourly rates charged by their attorneys for services rendered in the underlying proceedings. *Eley*, 793 F.3d at 100. "Whether an hourly rate is reasonable turns on three sub-elements: (1) 'the attorney's billing practices,' (2) 'the attorney's skill, experience, and reputation' and (3) 'the prevailing market rates in the relevant community.'" *Id.*, quoting *Covington*, 57 F.3d at 1107.

To establish the prevailing market rate, a plaintiff must "produce satisfactory evidence – *in addition to* the attorney's own affidavits – that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation.'" *Eley*, 793 F.3d at 100, quoting *Blum v. Stenson*, 465 U.S. 886, 895 n.11 (1984). Fee matrices are "one type of evidence that 'provides a useful starting point' in calculating the prevailing market rate." *Id.*, quoting *Covington*, 57 F.3d at 1109 (alternation in original). The Court of Appeals has noted that fee matrices are "somewhat crude" and can be supplemented with other forms of evidence such as surveys updating the matrices, "affidavits reciting the precise fees that attorneys with similar qualifications have received from fee-paying clients in comparable cases," and "evidence of recent fees awarded by the courts or through settlement to attorneys with comparable qualifications handling similar cases." *Id.* at 101, quoting *Covington*, 57 F.3d at 1109.

Here, there is no debate about whether plaintiffs have met their burden as to the first two prongs,[5] and the controversy over the reasonable hourly rate centers solely on what should be considered the "prevailing market rate." *See* Def.'s Opp. at 8. Plaintiffs argue that they are entitled

---

[5] Plaintiffs have provided adequate evidence supporting their attorneys' billing practices and their skill, experience, and reputation, and defendant does not challenge the supporting evidence. *See* Def.'s Opp. at 7–8 (positing that the "chief dispute" is about the proper prevailing market rate). Plaintiffs were represented in the administrative proceeding by Stevie Nabors, Esq. and Charles Moran, Esq. Mr. Nabors earned his law degree from American University's Washington College of Law in 2011 and was admitted to practice law in the District of Columbia in 2013 where he has primarily litigated IDEA cases. Decl. of Stevie Nabors, Esq., Ex. 13 to Pls.' Mem. [Dkt. # 7-13] ("Nabors Decl.") ¶ 2. He has successfully litigated more than thirty cases in the Office of Dispute Resolution, the District Court for the District of Columbia, and the D.C. Circuit. *Id.* ¶ 15. Charles Moran earned his law degree from Duke University Law School in 1967, he was admitted to the District of Columbia bar in 1968, and he has been practicing in the field of special education law, focusing on IDEA cases, for approximately twenty-five years. Decl. of Charles A. Moran, Esq., Ex. 14 to Pls.' Mem. [Dkt. # 7-14] ("Moran Decl.") ¶¶ 3–5. Both attorneys are members of Moran & Associates, a private public-interest law firm. Nabors Decl. ¶ 10.

Further, both lawyers averred that the firm adjusted rates in the last few years to be in accordance with the United States Attorneys' Office Fee Matrix. Moran Decl. ¶ 7; Nabors Decl. ¶¶ 5–6. That change was a reflection of recent D.C. Circuit precedent, as well as an effort to remain competitive with peers who were charging USAO *Laffey* Matrix rates. Moran Decl. ¶ 14; Nabors Decl. ¶¶ 5–6. Since that shift, the firm has "been paid [USAO] rates by clients on matters concerning education law, employment law, and labor rights." Nabors Decl. ¶ 9. Mr. Nabors also said that because the vast majority of cases the firm receives are appointed through the Counsel for Child Abuse and Neglect Panel, the attorneys "are barred by the D.C. Code from accepting payment from the client. As a consequence, [they] must accept these cases on a contingency basis and cannot charge the client any fees." *Id.* ¶ 10. Mr. Nabors asserted that "the firm's billing practices are structured" in a way to further the firm's primary purpose of assisting indigent children with disabilities rather than to generate [a] profit. *Id.* ¶ 11. He also averred that he "performed an exit audit to remove duplicitous time" from the invoice, *id.* ¶ 17, and both attorneys asserted that the remaining time billed is reasonable based on the relief secured. *Id.*; Moran Decl. ¶ 16.

to compensation based on the USAO *Laffey* Matrix. Pls.' Mem. at 8, 12.[6] Defendant maintains

that the USAO *Laffey* Matrix does not establish the "prevailing market rate" for IDEA litigation

because the matrix was intended to apply to complex federal litigation, which defendant insists

does not include IDEA litigation. Def.'s Opp. at 12–13. Instead, defendant posits that plaintiffs'

attorneys should be compensated at seventy-five percent of the USAO *Laffey* Matrix rate. *Id.* at

6.[7]

---

6      The *Laffey* Matrix is "a schedule of charges based on years of experience developed in *Laffey v. Northwest Airlines, Inc.*, 572 F. Supp. 354 (D.D.C. 1983), *rev'd on other grounds*, 746 F.2d 4 (D.C. Cir. 1984), *cert. denied*, 472 U.S. 1021, 105 (1985)." *Covington*, 57 F.3d at 1105, Two competing versions of the matrix have developed in the past thirty years: one developed by the United States Attorney's Office for the District of Columbia ("USAO *Laffey* Matrix"), which adjusts the original matrix for inflation using the Consumer Price Index for All Urban Consumers, and a second "enhanced" fee schedule, which adjusts the matrix rates for inflation using the Legal Services Index ("LSI *Laffey* Matrix"). *See Salazar ex rel. Salazar v. District of Columbia*, 809 F.3d 58, 62 (D.C. Cir. 2015); *Eley v. District of Columbia*, 793 F.3d 97, 101–02 (D.C. Cir. 2015). The version of the USAO *Laffey* Matrix that is relevant to this case is available at https://www.justice.gov/usao-dc/file/796471/download ("USAO *Laffey* Matrix"); *see* Ex. 18 to Pls.' Mem. [Dkt. # 7-18]. The applicable rate under the USAO *Laffey* Matrix for Stevie Nabors, who, at the time, had been in practice between two and three years, was $322.00 per hour, and the applicable rate for Charles Moran, who had been in practice for over thirty-one years, was $581.00 per hour. *See* USAO *Laffey* Matrix.

7      Plaintiffs contend that defendant is collaterally estopped from arguing that plaintiffs' counsel should only receive seventy-five percent of the USAO *Laffey* Matrix. Pls.' Reply at 6–9. They maintain that this issue was already litigated in a previous case between the same two parties in this Court. *See Merrick v. District of Columbia*, 134 F. Supp. 3d 328, 331 (D.D.C. 2015) ("*Merrick I*"); *see also* Pls.' Reply at 6–9. The doctrine of issue preclusion "bars 'successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment' even if the issue recurs in the context of a different claim." *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008). Issue preclusion requires that (1) the same issue being raised must have been contested by the same parties or privies and submitted to judicial determination in a prior case, (2) the issue must have been actually and necessarily determined by a court of competent jurisdiction in the prior case, and (3) the preclusive effect must not work a basic unfairness to the party bound by the first determination. *Yamaha Corp. of Am. v. United States*, 961 F.2d 245, 254 (D.C. Cir. 1992). "The very heart of the collateral estoppel doctrine is the requirement that the issue to be precluded must be substantially the same as the issue previously litigated." *Schneider v. Lockheed Aircraft Corp.*, 658 F.2d 835, 852 (D.C. Cir. 1981), *abrogated on other grounds by Williams Enters., Inc. v. Sherman R. Smoot Co.*, 938 F.2d 230 (D.C. Cir. 1991), citing *Montana v. United States*, 440 U.S. 147, 153 (1979). [Continued on next page].

In support of their position that the USAO *Laffey* Matrix provides the proper rates, plaintiffs have submitted a variety of evidence, including the fee matrix itself. As the Court of Appeals has said, fee matrices are a good place to start in determining the prevailing market rate. *Eley*, 793 F.3d at 100.

The D.C. Circuit has declined to weigh in on the question of whether IDEA litigation qualifies as "complex federal litigation" to warrant the presumptive application of any version of the *Laffey* Matrix. *See Reed*, 843 F.3d at 525 (concluding that the district court did not abuse its discretion in deciding not to award the higher LSI *Laffey* rates to attorneys for their work in IDEA cases, but expressly noting that it does "not mean to rule out the possibility that future fee applicants may be able to demonstrate that IDEA cases are 'complex federal litigation' to which the *Laffey* Matrix presumptively applies"); *Eley*, 793 F.3d at 105 (holding that the lower court abused its discretion in awarding fees at the higher LSI *Laffey* rate without requiring the plaintiff to demonstrate that those rates were in line with the prevailing rate). Judge Kavanaugh did state in his concurrence in *Eley* that the United States' Attorney's Office *Laffey* Matrix that plaintiffs

---

[Continued from previous page]. In *Merrick I*, the parties litigated four specific claims before a Hearing Officer relating to placing Mr. Washington in a residential facility, which then gave rise to the attorneys' fees litigation in this Court. 134 F. Supp. 3d at 332–33. The Court refused to reduce the USAO *Laffey* rate by twenty-five percent, and instead it awarded the attorneys the full rates according to the index. *Id.* at 339–40. Here, the defense is asking the Court to award the attorneys seventy-five percent of the USAO *Laffey* Matrix rate, which is the same as a request to reduce the rate by twenty-five percent. *See* Def.'s Opp. at 1, 6. Thus, on its face, it appears that defendant is litigating the same issue.

The Court of Appeals has not expressly held that IDEA litigation is complex enough to warrant the use of a specific matrix. *See Reed*, 843 F.3d at 525; *Eley*, 793 F.3d at 105. Rather, the determination depends on the specific facts of the case. *A.S.*, 842 F. Supp. 2d at 48 ("This court finds that the determination [of whether to reduce the *Laffey* rate] must be made in a case by case analysis."); *see also Hensley*, 461 U.S. at 429 ("The amount of the fee, of course, must be determined on the facts of each case."). Since the two *Merrick* cases arise out of separate controversies relating to Mr. Washington's IEP that took place at two distinct times, the issue of reducing the USAO *Laffey* Matrix rate is contingent upon a new set of operative facts that were not present in the first case. Whether a particular rate is appropriate depends on the facts of each case, so there is no preclusive effect on this case from the decision by this Court in *Merrick I*.

invoke in this case "is appropriate for IDEA cases." *Eley*, 793 F.3d at 105 (Kavanaugh, J., concurring).

Some courts have adopted the approach of discounting even the lower USAO *Laffey* rates to account for a lack of complexity in the underlying proceedings, *see McAllister v. District of Columbia*, 21 F. Supp. 3d 94, 108–10 (D.D.C. 2014), but many courts, including this one, have rejected the notion that IDEA administrative proceedings are "categorically less complex than other forms of litigation." *See, e.g.*, *Bucher v. District of Columbia*, 777 F. Supp. 2d 69, 74 (D.D.C. 2011); *Jackson v. District of Columbia*, 696 F. Supp. 2d 97, 102 (D.D.C. 2010). Those courts recognize that IDEA cases "take a variety of different litigation paths" and "cannot be dismissed as categorically routine or simple." *Thomas v. District of Columbia*, 908 F. Supp. 2d 233, 243 (D.D.C. 2012). IDEA cases "require testimony from education experts regarding whether a student has been denied a free and public education," *Jackson*, 696 F. Supp. 2d at 102, and plaintiff's counsel must "understand the bureaucratic workings of [DCPS], *Cox v. District of Columbia*, 754 F. Supp. 2d 66, 76 (D.D.C. 2010), and "must become conversant with a wide range of disabling cognitive, emotional, and language-based disorders and the corresponding therapeutic and educational approaches." *Sweatt v. District of Columbia*, 82 F. Supp. 3d 454, 460 (D.D.C. 2015).

Plaintiffs have proffered affidavits from attorneys who are familiar with, and who have litigated, IDEA cases, and they speak to the complexity of those types of cases. "Mere conclusory statements that IDEA litigation is 'as complex' as other types of cases deemed by this court to be 'complex federal litigation,' absent an explanation of *why* this is so, cannot suffice to meet [plaintiffs'] burden." *Reed*, 843 F.3d at 525. But the declarations supplied by plaintiffs here are sufficiently detailed to support plaintiffs' position that IDEA cases qualify as "complex federal litigation" so as to warrant the presumptive application of the USAO *Laffey* rates. *See* Decl. of

Elizabeth Jester, Esq., Ex. 15 to Pls.' Mem. [Dkt. # 7-15] ("Jester Decl.") ¶ 22 (explaining that a lack of discovery makes IDEA litigation very complex because attorneys only have a five-day disclosure period in which to produce and receive all documents that could be utilized at the hearing, and to prepare to examine various witnesses); *id.* ¶ 23 (discussing the complexity of learning and understanding "every discipline that touches the disabilities presented by the child at issue" so as to, for example, cross-examine the DCPS "psychologist on the nuances of cognitive, academic, behavioral, and emotional testing"); Verified Statement of Alana Hecht, Esq., Ex. 15 to Pls.' Mem. [Dkt. # 7-15] ("Hecht Decl.") ¶¶ 45–47 (discussing how "IDEA litigation involves the presentation of [an] entire bench trial, including the admission of exhibits, direct and cross examination of witnesses, opening and closing statements/arguments, and a robust motions practice," as well as the particular complexity behind "putting on a full trial with witnesses that are in the total control and employ of the [r]espondent"); *see also* Verified Statement of Nicholas Ostrem, Ex. 15 to Pls.' Mem. [Dkt. # 7-15] ("Ostrem Decl.") ¶ 9 (describing time consuming fee litigation in IDEA cases).

Therefore, the Court concludes that it is not appropriate to reflexively reduce the USAO *Laffey* Matrix rates by twenty-five percent to account for a lack of complexity in the underlying administrative proceedings. Furthermore, because an attorney's total fee award is determined by multiplying the number of hours expended by the hourly rate, reducing the USAO *Laffey* rates to reflect the brevity of the case improperly accounts for the length of the proceedings twice. *See Eley*, 999 F. Supp. 2d at 160 ("[T]he complexity of the case is accounted for by the number of hours expended and should not be accounted for by a blunt reduction of rates before applying the rates to the number of hours expended."), *vacated and remanded on other grounds*, 793 F.3d 97; *see also Flood v. District of Columbia*, 172 F. Supp. 3d 197, 208 (D.D.C. 2016) (observing that "an automatic reduction in the plaintiff's requested reimbursement rate based only on the

simplicity of an administrative proceeding runs counter to the Supreme Court's view that the relative complexity of a matter is generally presumed to be reflected fully in the number of hours billed," and that "reduction of the plaintiff's reimbursement rate in this manner risks double-counting the relative simplicity of the underlying proceedings"); *accord Sweatt*, 82 F. Supp. 3d at 460.

Moreover, plaintiffs have provided the Court with additional evidence to carry their burden of establishing that their requested rates reflect the "rates prevailing in the community in which the action or proceeding arose for the kind and quality of services furnished," 20 U.S.C. § 1415(i)(3)(C), even though additional proof of the prevailing market rate is not necessarily required after a plaintiff has shown that the IDEA case was complex. *See Reed*, 843 F.3d at 521, 525 (explaining that fee applicants in IDEA cases rely "on two separate, but inter-related, approaches to providing evidence of prevailing market rate": (1) "attempting to demonstrate that IDEA cases fall within the bounds" of complex federal litigation, and (2) "providing evidence of the fees charged, and received, by IDEA litigators"); *see also James v. District of Columbia*, 302 F. Supp. 3d 213, 221 (D.D.C. 2018) ("[T]he Circuit's more recent decision in *Reed* makes clear that a plaintiff must offer proof of the prevailing market rate that is independent of the USAO *Laffey* Matrix, absent a showing of complexity."); *Flood*, 172 F. Supp. 3d at 210 (confirming that fee applicants "may meet their burden upon either of two showings:" "that IDEA proceedings qualify as 'complex federal litigation,' to which *Laffey* rates presumptively apply," or "that rates customarily charged by IDEA practitioners in the District are comparable to those provided under the [USAO] *Laffey* Matrix").

Besides pointing to the fee matrix itself, a plaintiff may meet her burden by producing evidence "that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Eley*, 793 F.3d at

100. The evidence relevant to this inquiry includes "affidavits reciting the precise fees that attorneys with similar qualifications have received from fee-paying clients in comparable cases," "evidence of recent fees awarded by the courts or through settlement to attorneys with comparable qualifications handling similar cases," and market surveys updating the fee matrices. *Id.* at 101.

Here, plaintiffs have submitted five declarations from IDEA practitioners in this jurisdiction that support a finding that full USAO *Laffey* rates are the prevailing rates in the community for IDEA litigation. *See* Decl. of Carolyn Houck, Esq., Ex. 15 to Pls.' Mem. [Dkt. # 7-15] ("Houck Decl.") ¶¶ 6–10 (describing how she has practiced in the field of special education law since 1997 and has litigated more than 1,600 cases leading to due process hearings or settlement agreements under the IDEA, and charges clients "at or near the current attorney's fees matrix rates published by the USAO"); Jester Decl. ¶¶ 4, 12–13, 19 (stating that her primary practice area since 1987 has been children's rights, that it is her "normal practice to bill clients who are not indigent at rates equivalent to the rates set forth in the USAO Attorney's Fees Matrix," and detailing the numerous times she has been awarded full USAO *Laffey* rates by judges in this district); Hecht Decl. ¶¶ 12, 18 (averring that her law firm solely practices special education law, that it "currently matches its hourly rates to those in what is known as the USAO adjusted *Laffey* matrix," and that it "has had several paying clients that have paid these rates"); Ostrem Decl. ¶ 3 (stating that his law firm, which specializes in IDEA litigation, "has always matched its hourly rates to those in what is commonly known as the '*Laffey* Matrix'"); *id.* ¶¶ 6, 9 (describing how he found it "impossible to sustain" a practice "for indigent parents and students by relying on the 'fee-shifting' provision of the IDEA" for many reasons including, but not limited to, "some judges regularly awarding hourly rates at 75% of the rates in the USAO fee matrix"); Verified Statement of Douglas Tyrka, Ex. 15 to Pls.' Mem. [Dkt. # 7-15] ("Tyrka Decl.") ¶¶ 3–5 (declaring that he has almost exclusively practiced law in the field of special education since 2003, that the law firm

"has always . . . charged at hourly rates matching those in what is commonly known as 'the LSI *Laffey* Matrix,'" that "the firm has had several clients pay the firm at the LSI *Laffey* Matrix rates directly," and that "[t]he firm is currently retained by clients at the LSI *Laffey* Matrix rates").

Defendant takes issue with these declarations, arguing that they merely show what some attorneys charge clients, rather than what they actually receive from them. Def.'s Opp. at 8–9. They maintain that such statements do not provide convincing evidence of the prevailing market rate. *Id.* In support of this position, they point to other courts in this district that have found that declarations similar to the ones submitted in this case fall short of what is necessary to demonstrate the fees that attorneys have received from fee-paying clients in comparable cases. *Id.* at 8–10 (citing cases).

It is true that the declarations offered by plaintiffs in this case do not establish that IDEA attorneys uniformly collect fees comparable to the USAO *Laffey* Matrix. While the declarants aver that they charge those rates, only a few of them state that clients have paid them. *See* Hecht Decl. ¶ 12 (averring that her law firm "has had several paying clients that have paid these rates"); Tyrka Decl. ¶¶ 3–4 (declaring that "the firm has had several clients pay the firm at the LSI *Laffey* Matrix rates directly," and that "[t]he firm is currently retained by clients at the LSI *Laffey* Matrix rates"). And those declarants do not specify what proportion of their clients actually pay these rates.

But the declarants also emphasize that few, if any, IDEA claimants are able to afford representation in connection with their administrative claims. *See* Jester Decl. ¶ 19 (explaining that the majority of her clients are indigent and cannot afford to pay attorneys' fees or costs at any level); Houck Decl. ¶ 10 ("When representing special education clients on a contingency basis, attorneys in the District of Columbia accept that representation for the prospect of recovering fees based on the reasonable fee-shifting guidelines found in the USAO's attorneys fees matrix.");

Hecht Decl. ¶ 13 (averring that most of the firm's clients are indigent and that those "clients sign retainer agreements that do not require them to pay fees upfront but do advise them that the firm will be seeking full *Laffey* Matrix rates on the client's behalf").

While some courts in this district have found that statements like the ones made in the declarations in this case are unconvincing, *see Cox v. District of Columbia*, 264 F. Supp. 3d 131, 140 (D.D.C. 2017), at least one court has been "of the view" that such statements reflect "'precise fees' that an attorney has 'received from fee-paying clients' for IDEA litigation." *Wimbish v. District of Columbia*, 251 F. Supp. 3d 187, 194 (D.D.C. 2017), quoting *Eley*, 793 F.3d at 101. And, as another court has observed, "[a]t the end of the day, the Court is left with cases on both sides of the *Laffey* divide" when it comes to determining the prevailing market rate. *Copeland v. District of Columbia*, 208 F. Supp. 3d 255, 258 (D.D.C. 2016) (awarding attorneys at full USAO *Laffey* Matrix rates).

Given the existence of the fee-shifting statute in IDEA cases, and the relative rarity of paying special education clients, the Court finds that it would be unrealistic to expect a greater

level of specificity than what was submitted in this case.[8]  While the affidavits may not supply

conclusive evidence of the prevailing market rates in the relevant community, the Court finds that

the statements provided by the IDEA attorneys in their declarations sufficiently "recit[e] the

precise fees that attorneys with similar qualifications have received from fee-paying clients in

comparable cases." *Eley*, 793 F.3d at 101; *see also Flood*, 172 F. Supp. 3d at 213, 216 (concluding

that the declarations did "not demonstrate conclusively the prevailing market rates," but ultimately

holding that the plaintiff met her burden by providing the declarations in addition to evidence of

recent fees awarded by other courts in the same jurisdiction).

Further, plaintiffs supplement this evidence by pointing to recent fee awards in this district

in which prevailing IDEA claimants were reimbursed at full USAO *Laffey* rates.  *See* Pls.' Mem.

at 8–9 (citing cases); *see e.g.*, *Wimbish*, 251 F. Supp. 3d at 192–93 (concluding that the plaintiff

had met her burden to show that the USAO *Laffey* rates were the prevailing rates in the community

by providing affidavits from other attorneys as well as pointing to recent cases that had awarded

full rates); *Flood*, 172 F. Supp. 3d at 214 ("[A] review of recent IDEA fee awards indicates fairly

---

8       As this Court has pointed out in the past, any effort to determine a prevailing market rate
will fall short of perfection since the special education bar does not function in an ordinary market.
While there is a small portion of clients who can pay the full freight, these cases are litigated under
a fee-shifting statute, many attorneys willingly assume the risk that they may not be paid at all if
they are unsuccessful, and the fees obtained when plaintiffs prevail are ultimately set by judges
with varying points of view, some of whom regularly discount fee petitions by a variety of
percentages for a variety of reasons.  The situation cries out for a better solution.  *See Merrick I*,
134 F. Supp. 3d at 340 n.7 ("The Court notes that, in *Eley*, the Court of Appeals stated that
'evidence of the prevailing market rate can take many forms,' and suggested that a market survey
might also be a persuasive form of evidence.  But, given the existence of the fee-shifting statute in
cases like this one and the relative rarity of paying special education clients, one can hardly say
that a 'market' exists for services similar to the services offered in this case.  So, the exercise
contemplated by *Eley* will often produce awkward and less-than-ideal results.  There are going to
continue to be countless hours wasted by private counsel, DCPS, and the bench litigating not only
fee petitions, but also fees-on-fees petitions, until the District and the special education bar sit
down in good faith – with or without the assistance of a neutral mediator – and try to hammer out
a mutually acceptable presumptive fee schedule that is not as parsimonious and unrealistic as the
last one.") (internal citation omitted).

broad support among Judges on this Court for reimbursement at or above full USAO *Laffey* rates."); *Copeland*, 208 F. Supp. 3d at 258.[9]  The affidavits and cases, taken together, sufficiently demonstrate that plaintiffs have met their burden to prove that full USAO *Laffey* rates constitute the prevailing market rates for IDEA litigation practice in this jurisdiction.[10]

Because plaintiffs have met their burden, the Court must presume that the hourly rates are reasonable, and the burden shifts to the defense to provide "specific contrary evidence tending to show that a lower rate would be appropriate." *Covington*, 57 F.3d at 1109–10, citing *Nat'l Ass'n of Concerned Veterans*, 675 F.2d at 1326.

Defendant offers the declaration of Floyd Hayes, who serves as the Financial Program Analyst in the DCPS Office of General Counsel, to demonstrate that seventy-five percent of the USAO *Laffey* hourly rate is the prevailing market rate for attorneys practicing IDEA litigation and that the rate is sufficient to attract competent counsel.  *See* Decl. of Floyd Hayes [Dkt. # 8-2]

---

9      Even recent fee awards in the district may underestimate the prevailing market rate for IDEA litigation.  As another court has pointed out, many IDEA attorneys may request reimbursement below full USAO *Laffey* rates to avoid prolonged litigation and secure timely reimbursement.  *Flood*, 172 F. Supp. 3d at 213.

10      In addition, plaintiffs submitted a Department of Justice market survey conducted by economist Dr. Laura A. Malowane, as well as the 2015 National Law Journal market survey, to support their position that the USAO *Laffey* Matrix is the appropriate index to determine attorneys' fees.  *See* Decl. of Dr. Laura A. Malowane, Ex. 17 to Pls.' Mem. [Dkt. # 7-17] ¶ 4 ("In my opinion the attorney fee matrix issued and updated by the United States Attorneys' Office for the District of Columbia . . . is the appropriate matrix to use for purposes of determining plaintiff's attorneys' fees."); Ex. 16 to Pls.' Mem. [Dkt. # 7-16].  Defendant insists that the Court should disregard Laura Malowane's declaration because it was prepared for another case.  Def.'s Opp. at 14.  It also argues that the National Law Journal market survey "provides no evidence of the reasonable market rate" because it does not identify attorney years of experience, it includes a number of practice areas such as white collar crime and transactional attorneys, and it does not specify if the rates are merely charged by practitioners or actually received from clients.  *Id.* at 15.  Because the other evidence plaintiffs provided is sufficient for them to meet their burden, the Court need not evaluate the weight of this additional evidence.  The Court notes, however, that market surveys have been endorsed by the Court of Appeals as another form of evidence a plaintiff may provide to prove the prevailing market rate.  *See Eley*, 793 F.3d at 101.

("Hayes Decl."); Def.'s Opp. at 16–17. The declaration includes statistics regarding the number of invoices submitted, the number of invoices that were settled, and the amount of attorneys' fees that were requested and paid for fiscal years 2014, 2015, and 2016. *See* Hayes Decl. ¶¶ 5–7. In 2014, DCPS settled 241 of the 303 attorneys' fees invoices submitted; in 2015, DCPS settled 212 of the 310 invoices submitted; and in 2016, DCPS settled 173 of the 234 invoices submitted. *Id.* And in each year, all of the invoices that were settled were settled at seventy-five percent of the USAO *Laffey* Matrix rate. *Id.*

While this evidence shows that some lawyers have agreed to accept seventy-five percent of the USAO *Laffey* rates for their work on behalf of IDEA plaintiffs, settlement awards present drawbacks as evidence since they likely understate the prevailing market rates for special education attorneys. The Court cannot ignore the fact that settlements reflect compromises between two parties that have factored in the costs and risks of continued litigation. A settlement that includes the payment of attorneys' fees at a seventy-five percent USAO *Laffey* rate may be an indication of a fair rate, but it does not necessarily mean that the rate is the prevailing market rate.

This observation is bolstered by the affidavits plaintiffs provided, which aver that rates at seventy-five percent of the USAO *Laffey* Matrix are too low to enable IDEA attorneys to maintain a full-time practice serving almost exclusively non-paying IDEA clients. *See* Hecht Decl. ¶ 36 ("If I cannot get *Laffey* rates in a timely manner for the legal work I perform, I may not be able to continue serving the indigent population on a contingency basis."); Ostrem Decl. ¶¶ 6–9 (stating that he "found it impossible to sustain" a practice that was completely focused on IDEA cases for indigent parents and students because he "could not afford" it); Tyrka Decl. ¶ 7 (averring that "it has become very difficult to earn a reasonable income" from IDEA litigation, and "impossible to maintain a law firm that relies upon that work for the majority of its work"); *id.* ¶ 41 ("I believe

that with the sometime application of '75% USAO rates,' it is impossible to maintain a practice in which a large portion of the work is IDEA work for non-paying clients.").

Therefore, the information provided by the District is insufficient for it to meet its burden to provide "specific contrary evidence tending to show that a lower rate would be appropriate." *Covington*, 57 F.3d at 1109–10, citing *Nat'l Ass'n of Concerned Veterans*, 675 F.2d at 1326. Accordingly, the Court finds that the rates charged by Mr. Nabors and Mr. Moran are reasonable hourly rates for the legal services provided.

Utilizing the USAO *Laffey* rates, and adjusting the hours expended as outlined by the Court above, the Court will award plaintiffs' counsel $36,583.20 in attorneys' fees and $73.50 in costs.[11]

## III.    Plaintiffs' counsel are entitled to a fees-on-fees award.

Plaintiffs also ask the Court to "order fees-on-fees, based on the USAO Attorneys Fee Matrix." Pls.' Mem. at 13. However, plaintiffs did not submit a final invoice to the Court with their reply brief; rather, defendant was the party that attached a "draft" of plaintiffs' counsels' invoice for litigating the fee issue in this Court. *See* Ex. 1 to Def.'s Opp. [Dkt. # 8-1] ("Draft Invoice").[12] Because of this omission, the Court ordered plaintiffs to supplement their motion for attorneys' fees with a final invoice that covered the period through the filing of the reply brief in this case. Min. Order (June 15, 2018).

On June 19, 2018, plaintiffs submitted the final invoice and also attached declarations from two additional law firm employees who worked minimally on the case, Charles Sibert and Joseph Golinker. *See* Pls.' Suppl. Filing in Resp. to Ct.'s June 15, 2018 Order [Dkt. # 11]; Statement of

---

11      Defendant did not oppose the request for $73.50 in costs. *See* Def.'s Opp. at 21 ("Costs total $73.50 for the underlying administrative action . . . .").

12      The Draft Invoice included charges up through January 5, 2018. *See* Draft Invoice at 3. At that point in time, plaintiffs' counsels' fees had amounted to $9,960.40. *Id.*

Account II; Decl. of Charles A. Sibert, Esq. [Dkt. # 11-2] ("Sibert Decl.");[13] Decl. of Joseph

Golinker [Dkt. # 11-3] ("Golinker Decl.").[14]  Plaintiffs are seeking $21,013.40 in attorneys' fees

for 58.5 hours of work and $492.40 in costs for pursuing this fee litigation.  *See* Statement of

Account II at 5.[15]

"IDEA litigants are entitled to receive compensation for the hours expended pursuing an

initial fee award in District Court."  *Reed*, 843 F.3d at 526.  The Court of Appeals "has yet to

determine whether all aspects of an IDEA litigation should be treated as a unified whole, subject

to the same prevailing market rate."  *Id.*  But it has held that subsequent fee litigation should be

considered part of the same action as the underlying administrative proceeding.  *See Jester v. Gov't

of the District of Columbia*, 474 F.3d 820, 821–22 (D.C. Cir. 2007) (holding that an IDEA

administrative proceeding and the subsequent judicial proceeding constitute "one action");

*Kaseman v. District of Columbia*, 444 F.3d 637, 642–43 (D.C. Cir. 2006) (concluding that fees-

on-fees litigation is part of the same action as the IDEA administrative hearing).  And the Court

---

13     Charles Sibert earned his law degree from American University Washington College of
Law in May 2016 and was admitted to practice law in Michigan in June 2017.  Sibert Decl. ¶ 2.
Shortly after his admittance to the Michigan bar, he began practicing law in Washington, D.C.
under the supervision of Charles Moran and Stevie Nabors pursuant to D.C. Court of Appeals Rule
49(c)(8).  *Id.* ¶ 3.  Mr. Sibert was admitted to the D.C. bar on February 5, 2018.  *Id.* ¶ 4.  Mr. Sibert
averred that his practice focuses on special education law under the IDEA, and that his billing rate
is $302.00 per hour pursuant to the current USAO *Laffey* Matrix.  *Id.* ¶¶ 6–7.

14     Joseph Golinker earned his law degree from American University Washington College of
Law in 2014, and he is a member of the State Bar of New Mexico.  Golinker Decl. ¶¶ 2, 10.  He
has five years of combined experience in special education teaching, law, and advocacy, and he
currently works as a law clerk at Moran and Associates.  *Id.* ¶¶ 7, 9.  The firm "customarily bills
for [his] time at the USAO matrix paralegal rate," which is $164.00 per hour.  *Id.* ¶ 11; *see also*
USAO *Laffey* Matrix.

15     Plaintiffs' Draft Invoice originally sought $490.60 in costs, and defendant did not oppose
that request in its brief.  *See* Draft Invoice at 3; Def.'s Opp. at 21 ("Costs total . . . $490.60 incurred
for fees on fees.").  Although the amount now includes an additional $1.80 charge for printing, *see*
Statement of Account II at 5, the Court will continue to treat the request for costs as unopposed.

of Appeals in *Reed* upheld a district court's decision to award fees-on-fees at the same prevailing

market rate as the underlying fee award for the administrative action. *Reed*, 843 F.3d at 527

Defendant argues that the hourly rate awarded for the time spent preparing plaintiffs' fee

petition should be fifty percent of the USAO *Laffey* Matrix rate. Def.'s Opp. at 17.[16] To support

its position, the defense points to a few cases in this district that have ordered fees-on-fees awards

at fifty percent of the USAO rates. *See* Def.'s Opp. at 17 (citing cases). But all of those cases

were decided prior to the Circuit's decision in *Reed*, 843 F.3d at 526. And since then, courts in

this district have ordered fees-on-fees awards at the same rates as those awarded to the attorneys

for the underlying administrative action. *See, e.g.*, *Shaw v. District of Columbia*, 253 F. Supp. 3d

267, 268–69 (D.D.C. 2017) (awarding full USAO *Laffey* rates for fees-on-fees litigation, and

agreeing with other courts "that a plaintiff seeking fees on fees need not again demonstrate that

the fee rate sought is reasonable"); *McNeil v. District of Columbia*, 233 F. Supp. 3d 150, 154–55

(D.D.C. 2017) (awarding seventy-five percent of USAO *Laffey* rates in both the underlying fee

award and the fees-on-fees award, and observing that relitigating the fee issue "would be illogical

given that the initial fee proceeding and this proceeding are parts of the same action").

The District has "failed to provide any evidence suggesting that the 'prevailing market rate'

for fees-on-fees is distinct from the rate used to calculate attorneys' fees for the administrative

proceedings." *Reed*, 843 F.3d at 526 (concluding that the district court did not abuse its discretion

in applying the same rate for fees for the administrative proceedings and fees-on-fees in light of

---

16    Defendant also maintains that the fifty percent rate should be applied to the entry on
plaintiffs' invoice "related to the underlying administrative action, which bills two hours' time for
reviewing and preparing the invoice." Def.'s Opp. at 17; *see* Statement of Account I at 12 ("Exit
audit invoice."). But defendant gives no legal reason for why the Court should reduce the rate
assigned to that entry. Further, the District already asserted that the "prevailing market rate" is
seventy-five percent of the USAO *Laffey* rate, and the Court has already rejected that position.

the "failure to submit evidence of any meaningful difference between th[e] two types of litigation"). Therefore, the Court will award plaintiffs' attorneys fees for the instant fee litigation at the full USAO *Laffey* Matrix rate.

But that does not end the inquiry. An attorneys' fee award is determined by the "number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Hensley*, 461 U.S. at 433. Thus, the Court must also determine if the 58.5 hours of time spent seeking compensation for the 95 hours devoted to the client was reasonable. *See generally* Statement of Account II. In making the fee calculation, the court "should exclude . . . hours that were not 'reasonably expended,'" such as for work that is "excessive, redundant, or otherwise unnecessary." *Hensley*, 461 U.S. at 434 (internal citation omitted). Further, the court may consider a variety of factors to determine if the overall fee award should be adjusted "upward or downward, including the important factor of the results obtained.'" *Id.* (internal quotation marks omitted). "There is no precise rule or formula for making these determinations. The district court may attempt to identify specific hours that should be eliminated, or it may simply reduce the award to account for the limited success. The court necessarily has discretion in making this equitable judgment." *Id.* at 436–37.

After plaintiffs failed to file a final invoice with their reply brief, the Court instructed plaintiffs to submit "a final invoice that covers the period *through the filing of the reply brief* in this case." Min. Order (June 15, 2018) (emphasis added). While plaintiffs responded to the order, they submitted a final invoice that included billable time after the filing of the reply brief on February 20, 2018. *See* Statement of Account II at 5 (billing 0.10 hours for "[r]ead[ing] the Court's minute order," and 1.20 hours for auditing the invoice, which included a review to "verify dates of pleadings, ecf notices, and email communications"). The Court finds that including any time counsel chose to devote to the matter after February 20, 2018 would be unreasonable, and that

counsel should not be compensated for it. Therefore, the invoice will be reduced by the 0.10 hours of time billed by Mr. Moran and the 1.20 hours billed by Mr. Nabors, for a reduction of $475.40.

The only challenge defendant makes to the hours expended on the fees-on-fees litigation is to a time entry on January 5, 2018. Def.'s Opp. at 18. On that date, Mr. Moran billed 1.90 hours of time for "[r]eview[ing] prior HOD and complete client file, and compar[ing] to current procedural posture." Statement of Account II at 4. Defendant argues that the Court should discount the invoice by 1.90 hours because "[n]o clear inference lies supporting the relation of this entry to their current motion or argument." Def.'s Opp. at 18. Because plaintiffs do not respond to this argument in their reply brief, *see generally* Pls.' Reply, and the Court cannot determine the purpose of this work – or why it took nearly two hours to complete – the Court will also reduce the fees on fees award by the $1,143.80 billed for this time entry.

These deductions would result in an award of $19,394.20 in attorneys' fees and $492.40 in costs for the fee litigation, or a fees on fees award equal to approximately fifty-three percent of the fee for litigating the matter at the full USAO *Laffey* Matrix rate. The Court finds this to be somewhat disproportionate and excessive, since the hours to be spent on the fee petition were largely within counsel's control, and in its discretion, it will reduce the fees on fees award to $12,000.00, or approximately one third of the fee for litigating the matter.

**CONCLUSION**

For the foregoing reasons, the Court will grant plaintiffs' motion for attorneys' fees in part, and it will award plaintiffs' counsel $36,583.20 in attorneys' fees and $73.50 in costs for the underlying administrative proceeding, and $12,000.00 in attorneys' fees and $492.40 in costs for litigating the fee petition in this Court.  Judgment will be entered for plaintiffs in the amount of $49,149.10 in attorneys' fees and costs.

A separate order will issue.

AMY BERMAN JACKSON
United States District Judge

DATE:  July 13, 2018